# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | 3:10-CR-169 |
| | ) | |
| | ) | (PHILLIPS/SHIRLEY) |
| JEFFREY WHALEY, and | ) | |
| JERRY D. KERLEY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.§ 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on (1) Defendant Kerley's Motion to Dismiss Counts 1 Through 17 [Doc. 46] and (2) Motion to Dismiss Count 20 (Money Laundering) for Failure to State an Offense [Doc. 48], both filed on May 19, 2011. Defendant Whaley moved [Doc. 52] and was permitted [Doc. 69] to join in these motions. This Report and Recommendation addresses both of these motions. The parties appeared before the undersigned for a hearing on the motions on July 14, 2011. Assistant United States Attorneys F.M. Hamilton, III, and Zachary C. Bolitho appeared on behalf of the Government. Attorneys W. Thomas Dillard and Wade V. Davies represented Defendant Kerley, and Attorney Tracy Jackson Smith represented Defendant Whaley. Both Defendants were also present. Following the hearing, Defendant Kerley filed a supplemental brief

1

[Doc. 83] on November 10, 2011. The Government responded [Doc. 87] to the supplemental brief on November 23, 2011. After receiving these filings, the Court took the motions under advisement.

## I. POSITIONS OF THE PARTIES

The Defendants are charged in a Fifth Superseding Indictment [Doc. 80][1] with conspiracy to commit wire fraud and bank fraud (Count 1), eight counts of wire fraud (Counts 2-9), eight counts of bank fraud (Counts 10-17), two counts of making a false statement to influence a financial institution (Counts 18-19), and one count of money laundering (Count 22). Defendant Whaley is charged with two additional counts of money laundering (Counts 20-21). The charges are based on an alleged plan by the Defendants to profit from the sale of eight properties in Sevier County, Tennessee. The Defendants are alleged to have obtained "straw borrowers," who agreed to purchase the properties and to apply for mortgage loans to get the funds to purchase the properties and who were told that they would not have to make a down payment or mortgage payment on the properties. The Indictment alleges that the Defendants made material false representations and omissions, including concealing that the down payments for the properties did not come from the straw borrowers, on loan documents to Citizens Bank and SunTrust Mortgage to induce these entities to lend mortgage proceeds to the straw borrowers. Citizens Bank, an FDIC insured bank, and SunTrust Mortgage, from its account at SunTrust Bank, an FDIC insured bank, wired mortgage proceeds to

---

[1]The Defendant's motions relate to the Third Superseding Indictment [Doc. 41]. On September 14, 2011, the Government brought a Fourth Superseding Indictment [Doc. 74] to correct clerical errors. A Fifth Superseding Indictment [Doc. 80] was filed on October 18, 2011. This Indictment adds two new counts, Counts 18 and 19, charging that the Defendants made a false statement to influence a financial institution. Accordingly, former Counts 18 through 20 are now Counts 20 through 22.

2

Guaranty Land Title, the closing agency owned by Defendant Kerley.

The Defendants contend that Counts 1 through 17 and 20 through 22 of the Indictment should be dismissed because they (1) fail to state an offense as a matter of law, (2) provide insufficient notice of the charges against the Defendants, and (2) are multiplicitous.

The Government responds that each count of the Indictment properly alleges all the elements of the charged offense. It contends that the Indictment alleges sufficient facts to put the Defendants on notice of the charges against which they have to defend, to prevent surprise at trial, and to protect against a future Double Jeopardy violation. Finally, it asserts that the Indictment does not offend Double Jeopardy because it is not multipicitious.

## II. ANALYSIS

Our Constitution requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment by a grand jury[.]" U.S. Const. amend. V. The Defendant challenges the legal sufficiency of the Fifth Superseding Indictment, contending that it contains three kinds of pleading defects: (1) that the Indictment fails to state the offenses of wire fraud, bank fraud, conspiracy to commit wire and bank fraud, and money laundering, (2) that the Indictment's allegations of bank fraud give insufficient notice of those charges, and (3) that the Indictment's wire fraud, bank fraud, and conspiracy charges are multiplicitous. After reviewing the applicable statutes and case law, the Court concludes that the wire and bank fraud counts relating to SunTrust Bank (Counts 4-9 and Counts 12-17) are multiplicitous and should be merged. In all other respects, the Fifth Superseding Indictment does not violate the Fifth or Sixth Amendments.

The Fifth Amendment provides that "a trial may be held in a serious federal criminal case

only if a grand jury has first intervened" and issued an indictment or presentment. Russell v. United States, 369 U.S. 749, 760-61 (1962). Legally insufficient indictments implicate not only the right to a grand jury's determination of probable cause to believe that the offense occurred but also the Fifth Amendment's guarantee of due process of law and protection against being twice placed in jeopardy for the same offense. Hamling v. United States, 418 U.S. 87, 117 (1974); Russell, 369 U.S. at 761. Also relevant is the Sixth Amendment's provision that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and the cause of the accusations[.]" U.S. Const. amend. VI; Russell, 369 U.S. at 761. It is in the context of these fundamental rights that the Court examines the sufficiency of the instant Fifth Superseding Indictment.

## A. Failure to State an Offense

The Defendants argue that Counts 1 through 3, Counts 12 through 17, and Counts 20 through 22 of the Fifth Superseding Indictment should be dismissed because they fail to state the offenses of conspiracy to commit wire and bank fraud, wire fraud, bank fraud, and money laundering. With regard to Counts 2 and 3, the Defendants contend that these counts fail to state the offense of wire fraud because the Indictment does not allege facts showing that Citizens Bank was "affected," harmed, or suffered any negative consequences. The Defendants argue that as a result of this failure, Counts 2 and 3 are also barred by the statute of limitations because the extended statute of limitations for wire fraud affecting a financial institution does not apply. Second, the Defendants contend that Counts 12 through 17 fail to state the offense of bank fraud because the Indictment fails to allege facts showing that they had the intent to defraud a bank, rather than a third party. Third, the Defendants assert that Count 1 fails to state an offense because the defects in the substantive wire

4

and bank fraud charges affect the conspiracy charge, making it defective as well. Finally, the Defendants allege that Counts 20 through 22 fail to state the offense of money laundering because the alleged monetary transaction occurred before the predicate offense of wire fraud was complete and was comprised of receipts, rather than profits.

The Government responds that the Indictment contains all the elements of the charged offenses, fairly informs the Defendants of the charges, and permits them to plead an acquittal or conviction to bar future prosecutions for the same offenses. Accordingly, it argues that the Indictment is constitutionally sufficient and that the Defendants' allegations actually amount to a challenge to the sufficiency of the Government's proof, a matter which cannot be decided prior to the trial of the matter.

"The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). In order to comport with constitutional notice requirements, an indictment must "first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling, 418 U.S. at 117; United States v. Landham, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting Hamling). An indictment may allege the charges using the words of the statute itself as long as it gives all the elements of the offense "'fully, directly, and expressly[.]'" Hamling, 418 U.S. at 117 (quoting United States v. Carll, 105 U.S. 611, 612 (1882)); Landham, 251 F.3d at 1079. Moreover, the statutory language "'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'" Hamling, 418 U.S. at 117-18 (quoting United States v. Hess, 124 U.S. 483,

5

487(1888)); Landham, 251 F.3d at 1079. "To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177 (6th Cir. 1992) (quoting Hamling, 418 U.S. at 118).

*(1) Wire Fraud Charges (Counts 2-3)*

The Defendants contend that the Indictment fails to plead "a prima facie case of wire fraud affecting a financial institution" because it fails to allege facts showing that a financial institution was "affected," harmed, or suffered any negative consequences. Section 1343 provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be fined . . . or imprisoned . . ., or both.

18 U.S.C. §1343. The statute provides for an enhanced punishment if the wire fraud "affects a financial institution[.]" 18 U.S.C. §1343.

The Defendants argue that although the Indictment alleges in Counts 2 and 3 that they defrauded Citizens Bank by submitting materially false loan documents and concealing information from Citizens Bank and that they did so in order to influence Citizens Bank's decisions to fund mortgage loans, factual allegations in the Indictment show that Citizens Bank was not harmed or victimized. They contend, instead, that the Indictment alleges that Citizens Bank agreed to make the mortgage loans in question "upon [SunTrust Mortgage's] determination that the mortgage loan

6

satisfied [SunTrust Mortgage's] underwriting requirements, and on the condition that [SunTrust Mortgage] agreed to purchase the mortgage loan after the loan's closing through Citizen[s] Bank's closing agent." [Doc. 80, ¶2]  The Defendants assert that the Indictment contains no allegation that Citizens Bank was put at risk, harmed, victimized, or suffered any negative consequences as a result of having made the two loans, which are the basis of Counts 2 and 3 and which SunTrust Mortgage had already agreed to purchase.  Thus, the Defendants argue that Counts 2 and 3 fail to state the offense of wire fraud *affecting* a financial institution.

The Government responds that the Indictment does not have to provide the details of the Government's evidence regarding how the Defendants' fraudulent scheme affected the financial institution.  It contends that Counts 2 and 3 track the language of section 1343, charging as follows:

> From on or about August 30, 2005 through on or about November 10, 2005, the defendants, JEFFREY WHALEY and JERRY D. KERLEY, aided and abetted by, and aiding and abetting, each other and others known and unknown to the grand jury, did knowingly, willfully, and with the intent to defraud, devise and participate, and attempt to devise and participate, in a scheme and artifice to defraud and to obtain money and funds from Citizens Bank by means of material and fraudulent pretenses, representations, and omissions [and that] . . . [o]n or about the dates set forth below, within the Eastern District of Tennessee, and elsewhere, the defendants,  JEFFREY WHALEY and JERRY D. KERLEY, aided and abetted by, and aiding and abetting, each other and others known and unknown to the grand jury, did knowingly, willfully, and with the intent to defraud, for the purpose of executing and participating in the scheme described above in paragraphs 72 through 74, and attempting to do so, and aiding and abetting its execution, cause to be transmitted, by means of wire and radio communication in interstate commerce the following writings, signs, and signals, thereby affecting a financial institution with each commission of the offense, namely Citizens Bank, whose deposits were then insured by the Federal Deposit Insurance Corporation:

(Count 2) a wire transfer on October 21, 2005, of $414,766.19 in mortgage proceeds from Citizens

Bank to the bank account of Guaranty Land Title and (Count 3) a wire transfer on November 10, 2005, of $618,230.36 in mortgage proceeds from Citizens Bank to the bank account of Guaranty Land Title. [Doc. 80, ¶¶73-75]

The Government contends that in addition to providing the elements of wire fraud, the Indictment informs the Defendants of all the relevant facts, including the time frame of the scheme, the wire transmissions at issue, the identity of the financial institution, and the nature of the fraudulent scheme. Accordingly, the Government contends that Counts 2 and 3 are sufficiently pled. It argues that the Defendants' argument that Citizens Bank was not affected because SunTrust Mortgage had agreed to buy loans from Citizens Bank is in the nature of a motion that the Government's evidence is insufficient to support a conviction and is, therefore, premature.

As discussed above, an indictment must allege sufficient facts to "inform the accused of the specific offense, coming under the general description, with which he is charged." Hamling, 418 U.S. at 117-18 (internal quotation omitted). In the present case, the Court finds that the Fifth Superseding Indictment sufficiently informs the Defendants that Citizens Bank was affected by the alleged wire fraud. In addition to the language quoted above stating that the wire transmissions affected Citizens Bank, the Indictment specifically states that the Defendants submitted documents to Citizens Bank that contained "material misrepresentations" . . . "for the purpose of influencing Citizens Bank's decision to fund a mortgage loan" for the purchase of two specified properties. [Doc. 80, ¶¶17, 22] The factual allegations that Citizens Bank transferred money based upon false information in loan documents is sufficient to allege the element that Citizens Bank was affected. Accordingly, the Court finds that the Indictment alleges facts in support of the charge that Citizens Bank was affected by the alleged wire fraud.

8

Despite the presence of these factual allegations showing the affect on Citizens Bank, the Defendants argue that as a matter of law, the facts alleged in the Indictment cannot constitute wire fraud affecting a financial institution because SunTrust Mortgage had agreed to purchase the loans before Citizens Bank agreed to lend the funds for the properties at issue in Counts 2 and 3. "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). Although a defect in the indictment, such as its failure to state an offense, can be challenged before trial, Fed. R. Crim. P. 12(b)(3)(B), generally in criminal cases, the Court cannot rule upon the sufficiency of the Government's evidence before trial. See United States v. Calandra, 414 U.S. 338, 345 (1974) (holding that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on inadequate or incompetent evidence"); United States v. Davis, 873 F.2d 900, 907 (6th Cir. 1989); United States v. Short, 671 F.2d 178, 183 (6th Cir. 1982). From Rule 12(b) and the case law, the Court distills two requirements for addressing a motion to dismiss the indictment which alleges that the government cannot establish the offense charged as a matter of law: (1) the issue raised must be a question of law and (2) the relevant facts must be undisputed[2]. United States v. Levin, 973 F.2d 463, 470 (6th

_____

[2]The undisputed nature of the evidence is an important predicate to a court's determination of a motion to dismiss the indictment. If the evidence relating to the issue raised by the parties is disputed, the court runs the risk of treading upon the role of the grand jury:

> When a body of citizens, properly chosen and constituted as a grand jury, finds probable cause to believe that a crime has been committed within its jurisdiction, that finding is sufficient to require a trial. The indictment is not evidence, as every petit jury in a criminal case is instructed. The prosecution must still produce evidence from which the trial jury can find every element of the offense proven beyond a reasonable doubt, or the defendant is entitled to a judgment of acquittal. However, the prosecution's evidence is tested at trial, not in a preliminary proceeding.

9

Cir. 1992); <u>United States v. Jones</u>, 542 F.2d 661, 665 (6th Cir. 1976).

The Court finds the question of whether the Defendants engaged in fraudulent conduct that affected Citizens Bank is a question of fact that is in dispute. The Defendants argue that SunTrust Mortgage had already agreed to purchase the loans from Citizens Bank before Citizens Bank agreed to lend the money based upon alleged material misrepresentations. The Government points out that the agreement between Citizens Bank and SunTrust Mortgage required Citizens Bank to repurchase any loan based upon false or misleading information, even if Citizens Bank did not know about the falsehood. Thus, the level of risk to Citizens bank is in dispute. Accordingly, the Court finds that the resolution of whether Citizens Bank was affected by the alleged wire fraud is a factual question to be determined by the jury after seeing and hearing all the evidence. The Court finds that Counts 2 and 3 properly charge the Defendants with wire fraud. Whether the evidence exists to prove those allegations beyond a reasonable doubt is a matter for the trier of fact.

The Defendants also argue that because the Indictment does not adequately allege wire fraud affecting a financial institution, Counts 2 and 3 are also barred by the statute of limitations because the extended statute of limitations for affecting a financial institution does not apply. The statute of limitations for wire fraud is typically five years. 18 U.S.C. §3282(a). When wire fraud affects a financial institution, the statute of limitations is ten years. 18 U.S.C. §3293(2). Counts 2 and 3 allege that the Defendants engaged in a scheme to defraud Citizens Bank from August 30, 2005, through November 10, 2005. The original Indictment [Doc. 1] in this case, charging Defendant

---

United States v. Short, 671 F.2d 178, 183 (1982); <u>see also</u> Levin, 973 F.2d at 472 (Boyce, J., dissenting) (decrying "the district court's pre-trial decision that the government would not be able to establish the requisite criminal intent at trial [as being], in essence, a decision that the indictment was based on insufficient or inadequate evidence").

10

Whaley, was filed on December 21, 2010. The first Superseding Indictment [Doc. 18], charging both Defendants, was filed on February 15, 2011. The Court finds that the Indictment properly alleges wire fraud affecting a financial institution and, therefore, the charges were brought within the applicable ten-year statute of limitations.

### (2) Bank Fraud Charges (Counts 12-17)

The Defendants contend that Counts 12 through 17, alleging bank fraud in relation to SunTrust Bank, fail to state an offense because they do not allege facts that demonstrate that the Defendants intended to defraud or victimize a bank. They argue that the Sixth Circuit case law holding that the bank fraud statute does not require an intent to defraud a bank should be discounted in favor of the rule in other circuits requiring that the intent to defraud or victimize must be directed toward a bank. The Defendants assert that under this interpretation of the statute, the instant Indictment fails to allege bank fraud in Counts 12 through 17 because it provides no factual allegation from which an intent to defraud a bank could be found. The Government responds that Counts 12 through 17 allege bank fraud consistent with Sixth Circuit case law and that the Defendant's insistence that the alleged facts do not prove a risk of loss to SunTrust Bank is again a premature argument about the sufficiency of the evidence.

Counts 12 through 17 charge the Defendants with bank fraud with respect to SunTrust Bank. An individual commits bank fraud when he or she "knowingly executes, or attempts to execute, a scheme or artifice–(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]" The

11

Indictment alleges that

> From on or about October 27, 2005 through on or about March 9, 2006, the defendants, JEFFREY WHALEY and JERRY D. KERLEY, aided and abetted by, and aiding and abetting, each other and others known and unknown to the grand jury, did knowingly, willfully, and with the intent to defraud, execute and participate, and attempt to execute and participate, in a scheme or artifice to defraud a financial institution, namely SunTrust Bank, whose deposits were then insured by the Federal Deposit Insurance Corporation, and to obtain, money, funds and credits under the custody and control of SunTrust Bank, by means of materially false and fraudulent pretenses, representations, and omissions.

[Doc. 80, ¶85] The Indictment describes the manner and means of the alleged scheme and artifice to defraud SunTrust Bank in paragraphs 7 through 15 and 26 through 70, which describe "material misrepresentations by omission" by the Defendants to SunTrust Mortgage, a wholly owned subsidiary of SunTrust Bank,

> concealing the fact that persons, other than the borrowers, were providing the funds at closing to satisfy the amount recorded as the 'cash from borrower' on HUD-1 Settlement Statements, for the purpose of inducing [SunTrust Mortgage] . . . to lend, wire and disburse through its closing agent the mortgage loan proceeds wired to and entrusted with its closing agent, Guaranty Land Title, and for the purpose of preventing [SunTrust Mortgage] . . . from . . . demanding the return of those mortgage loan proceeds.

[Doc. 80, ¶15] With regard to each of six properties, the Indictment alleges that the Defendants caused SunTrust Mortgage to transmit mortgage proceeds from its account at SunTrust Bank to the account of Guaranty Land Title, which is a real estate closing agency owned by Defendant Kerley, "a transaction which caused SunTrust Bank to transfer funds and money under its custody and control and which exposed SunTrust Bank to some degree of risk." [Doc. 80, ¶¶29, 34, 42, 51, 61, and 69]. The Indictment also describes the execution of the bank fraud scheme, identifying the dates

12

of the transactions, the properties, the amounts of mortgage proceeds transferred, and the nature of the false representations in the HUD-1 Settlement Statements. [Doc. 80, ¶87]

The Defendants contend that although the Indictment alleges that they defrauded SunTrust Bank, all the factual allegations relate to SunTrust Mortgage and reveal that SunTrust Bank's sole role was the transfer of funds from SunTrust Mortgage's account. They argue that SunTrust Bank was nothing more than the repository of funds for SunTrust Mortgage and that, as such, SunTrust Bank was not exposed to any risk from SunTrust Mortgage's request that it transfer funds from SunTrust Mortgage's account. Accordingly, the Defendants argue that because the Indictment does not allege facts showing that they intended to defraud *SunTrust Bank* or that the transfer of SunTrust Mortgage's funds by SunTrust Bank caused SunTrust Bank any risk of loss, the Indictment fails to allege the crime of bank fraud in Counts 12 through 17.

The Government responds that in the Sixth Circuit, the crime of bank fraud can be shown by an intent to defraud a third party, which causes a bank to transfer funds or to incur a risk of loss. Thus, the Government asserts that the instant Indictment properly charges that the Defendants made false statements to SunTrust Mortgage that induced SunTrust Mortgage to lend money and to transfer mortgage proceeds to them, which scheme to defraud caused SunTrust Bank to both transfer funds and to incur a risk of loss. The Government contends that the Defendants' argument that this conduct cannot constitute bank fraud to be a premature sufficiency-of-the-evidence argument, which is improper at this stage in the proceedings.

"Three elements are required for a conviction for bank fraud under 18 U.S.C. §1344: (1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial

institution was insured by the FDIC." United States v. Everett, 270 F.3d 986, 989 (6th Cir. 2001);

see also United States v. Warshak, 631 F.3d 266, 312 (6th Cir. 2010), rehg *en banc* denied, (Mar.

7, 2011); United States v. Reaume, 338 F.3d 577, 580 (6th Cir. 2003). The Defendants focus on the

second element, contending that the intent to defraud SunTrust Mortgage cannot constitute bank

fraud as a matter of law because there was no misrepresentation or risk of loss to SunTrust Bank.

The Government correctly points out that under Sixth Circuit case law, one may be convicted

of bank fraud without ever having intended to defraud a bank. In other words, "a scheme to defraud

a financial institution" can be proven by an intent to defraud a third party when the implementation

of that fraudulent scheme "either causes a federally insured financial institution to transfer funds or

exposes that institution to some degree of risk." Warshak, 631 F.3d at 313. Thus, in United States

v. Everett, an accountant forged a client's name on checks, which were then drawn on the client's

account at an FDIC insured bank. 270 F.3d at 988-89. Defendant Everett argued that the

Government failed to prove the specific intent to defraud the bank or to put the bank at a risk of loss.

Id. at 990. The Sixth Circuit held that

> to have the specific intent required for bank fraud the defendant need
> not have put the bank at risk of loss in the usual sense or intended to
> do so. It is sufficient if the defendant in the course of committing
> fraud on *someone* causes a federally insured bank to transfer funds
> under its possession and control. See 18 U.S.C. § 1344(2) (2000).

> It has been stated that the purpose of § 1344 is to protect the
> federal government's interest as an insurer of financial institutions.
> Thus, even if [Defendant Everett] did not intend to defraud the bank,
> causing a bank to transfer funds pursuant to a fraudulent scheme
> reduces the funds the bank has available for its loans and other
> activities and almost inevitably causes it some loss.

Id. at 991 (footnote omitted). In so holding, the appellate court cautioned that in cases in which the

14

bank has only "minimal involvement, such as where a swindler deceives someone into voluntarily writing checks to the swindler on a good account," the mail or wire fraud statutes would likely be more applicable. Id. However, when the "minimal involvement" of the bank involves the transfer of funds and places the bank "at some risk of loss, if only in the loss of some of the deposits," the action amounts to bank fraud, "although the perpetrator may intend to defraud someone other than the bank." Id. The court held that this construction serves the purpose of the bank fraud statute, "which is to protect the federally insured deposits," and aligns the bank fraud statute with the mail and wire fraud statutes, "which require only that the mail or wire communication be used to facilitate the fraud." Id.

The Sixth Circuit further refined its construction of the intent element of the bank fraud statute in United States v. Reaume, 338 F.3d 577 (6th Cir. 2003). In Reaume, the defendants established bank accounts in their own names and using false names. Id. at 579. The defendants then engaged in a scheme by which they purchased merchandise from stores using checks drawn on these accounts and returned the merchandise for cash refunds at other branches of the stores before the checks cleared the bank. Id. The bank refused to honor the checks because the defendants' accounts contained insufficient funds, and thus, the losses fell on the stores or their insurers. Id. The defendants argued that their convictions for bank fraud should be overturned because the evidence was insufficient to show that they intended to defraud the bank, rather than the stores and their insurers, or that the bank ever transferred any funds in relation to their scheme. Id. at 580-81. The appellate court relied upon its prior holding in Everett to conclude that "an intent to put the financial institution at a risk of loss is not required," but it expanded that holding to include situations in which the intent to defraud *someone* placed a bank "at a risk of loss," even if the bank did not

15

transfer funds. Id. at 581. The court reasoned that because the bank *could have* decided to honor

the checks, Reaume's scheme placed the bank at a risk of loss: "[I]t is clear that Reaume's fraudulent

activity, regardless of the intended victim, could have caused the Bank to transfer funds." Id. at 581-

82. Thus, the court held that the "intent to defraud the federally insured institution itself is satisfied

where: (1) the intent to defraud some entity was present; and (2) that intended fraud placed a

federally insured financial institution at a risk of loss." Id. at 582.

Our appellate court combined the holdings of Everett and Reaume in United States v.

Warshak, observing that "[i]n the Sixth Circuit, a defendant may be convicted of bank fraud if he

intends to defraud someone and implements a fraudulent scheme that either causes a federally

insured financial institution to transfer funds or exposes that institution to some degree of risk." 631

F.3d at 313. In Warshak, the defendants engaged in a scheme to sell a male enhancement product

by offering a "free" trial of the product for a shipping and handling charge and then automatically

sending and charging customers for subsequent shipments of the product. In order to obtain credit-

card processing services from banks and to prevent the banks from discontinuing those services,

Warshak falsely inflated the number of credit card sales in order to minimize the chargeback ratio

(the number of refunds to customer accounts as compared to total credit card sales). Id. at 314.

Warshak argued that the government had failed to prove bank fraud because there was no evidence

that "the manipulation of the chargeback ratio caused any of the merchant banks to transfer funds."

Id. Instead, the defendant argued that the banks merely credited his account with credit card

proceeds, after subtracting out transactions fees and chargeback fees, and thus, never lost access to

any of their funds. Id. at 314-15.

In Warshak, the Sixth Circuit determined that the evidence was sufficient to prove both that

16

the banks transferred funds and that the banks were exposed to a risk of loss. Id. at 315. First, the court observed that "without the chargeback scheme," the banks would have ended Warshak's merchant accounts and, thus, "the fraudulent scheme caused merchant banks to continue to release money under their control." Id. The court recognized that this alone–the fact that the banks transferred funds under their control–was sufficient to support the bank fraud convictions, even without a showing that the scheme put the banks at a risk of loss. Id. Second, the court concluded that the banks experienced risk from the chargeback scheme because they extended lines of credit to Warshak and they maintained their relationship with the defendant's company under a mistaken belief that the chargeback ratio was under one percent, thereby retaining risk that they otherwise would have cast off. Id. Accordingly, the appellate court found the evidence sufficient to prove that the defendants "acted with the requisite intent to defraud." Id.

Applying these holdings to the instant case, the Court finds that Counts 12 through 17 properly charge the offense of bank fraud. Each of the counts charges all three elements of bank fraud, alleging that the Defendants knowingly executed or attempted to execute a scheme to defraud SunTrust Bank, a financial institution; that the Defendants executed the scheme with the intent to defraud a third party SunTrust Mortgage, thereby causing SunTrust Bank to transfer funds and causing SunTrust Bank some risk of loss; and that SunTrust Bank was insured by the FDIC. See Warshak, 631 F.3d at 312-13 (listing the elements of bank fraud and holding that the intent element may be satisfied by showing that the defendant intended to defraud a third party and caused the bank to transfer funds or suffer a risk of loss).

The Defendants dispute that Counts 12 through 17 state facts constituting the second element because bank fraud requires an "intent to defraud–or at least victimize–a bank." [Doc. 46, p.16] In

other words, the Defendants maintain that bank fraud cannot occur without some risk of loss to the FDIC insured bank. The Court observes that the <u>Warshak</u> case holds that showing an intent to defraud a third party that causes a bank to transfer funds under its control constitutes the intent element of bank fraud, without any showing that the bank experienced a risk of loss. 631 F.3d at 315. Nevertheless, the Defendants argue that the better interpretation of the bank fraud statute would require an intent to defraud or victimize the bank, as is required by the Second and Third Circuits, which bar liability under §1344 when the bank was only an "unwitting instrumentality of the fraud," rather than a victim of the fraud.[3] <u>United States v. Laljie</u>, 184 F.3d 180, 190 (2d Cir. 1999); <u>United States v. Leahy</u>, 445 F.3d 634, 646-47 (3d Cir. 2006). They assert that this interpretation is consistent with both the policy behind the bank fraud statute and with the facts in the <u>Everett</u>, <u>Reaume</u>, and <u>Warshak</u> line of cases, in which the defendants' conduct presented a serious risk to the government's interest in insuring banks. In their supplemental brief, the Defendants point to Judge Curtis Collier's decision in <u>United States v. Rice</u>, No. 1:11-CR-15, 2011 WL 3841973 (E.D. Tenn. Aug. 30, 2011). Judge Collier found that "while risk of loss is not an element of the offense, it is a *sine qua non* for bank fraud." <u>Id.</u> at *3. The Defendants argue that Judge Collier's holding that the application of the bank fraud statute requires some risk of loss to an FDIC insured bank supports their interpretation that bank fraud cannot occur without the intent to defraud, or at least to victimize, the bank.

In concluding that a risk of loss must be present, Judge Collier canvassed the Sixth Circuit case law set out above and found that in all of these cases, the bank was exposed to some risk of loss.

---

[3]The Defendants request that, if the District Court concludes that the instant Indictment comports with Sixth Circuit case law, the issue be preserved for appellate review. [Doc. 47, p.16]

18

Id. at **5-10.  Judge Collier observed that in Everett, the court dismissed one bank fraud count in the indictment because it was based upon a check signed by Everett's codefendant who was an authorized signatory on the account.  Id. at *5.  In contrast, by forging the client's signature on checks, Defendant Everett subjected the bank to risk, even though she intended to defraud the client rather than the bank.  Id. at *5.  While the client would bear any loss with regard to the check signed by the codefendant, the bank would bear the risk of loss for the forged checks.  Id.  at **5-6.

> The statute's purpose of protecting the bank explains why the concern is with the risk of loss. [The codefendant's] actions did not pose a risk of loss to the bank because [the client], not the bank, faced the loss. The bank in that instance would not suffer a reduction in funds available for its loans and other activities, nor would it be on the hook for honoring the checks at issue, since [the codefendant] was an authorized signatory.  Everett's actions did pose a risk of loss to the bank because, in honoring a check with a forged signature, the bank might incur civil liability, might have to absorb a monetary loss, or, at the least, might face adverse reactions from its customer[, the client].  Additionally, Everett's actions would "almost inevitably cause [ ] [the bank] some loss" since payment of forged checks would reduce the funds the bank has available for its loans and other activities.

Id. at 6 (internal citations omitted).

Judge Collier also found this interpretation of the bank fraud statute and the case law to be in line with the policy behind the bank fraud statute: "[T]he purpose of the bank fraud statute 'is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions.'" Id. (quoting United States v. Staples, 435 F.3d 860, 867 (8th Cir. 2006) (internal quotations omitted)).  Likewise, Judge Collier observed that in both Warshak and Reaume, the banks were exposed to a risk of loss.  Id. at **9-10.

Applying this reasoning to the case before him, Judge Collier concluded that the information

19

and the factual basis in the plea agreement did not satisfy the requirements of the bank fraud statute. Id. at *11. Defendant Rice, an office manager for a company, stole money from her employer by withdrawing funds from the employer's account at an FDIC insured bank. Id. at *3. The defendant "did not make any representation or statement directly to [the bank]. Even though the checks or withdrawals were not authorized by [the defendant's employer], since Rice was an authorized signatory on the accounts, [the employer] bore the financial loss and [the bank] suffered no loss and bore no risk of lost." Id. at 4. Judge Collier found that although the defendant's actions resulted in the transfer of funds by the bank, this transfer of funds did not reduce the funds the bank had available for loans or other business because the defendant's employer bore the loss. Id. at *10. Judge Collier observed, "[i]n fact, although the Court's research has not been exhaustive, the Court has been unable to locate a single case from any circuit where a conviction for bank fraud has been upheld and there has not been either a clear risk of loss on the part of the victim bank, or an intent on the part of the defendant to expose the victim bank to a risk of loss." Id. Accordingly, Judge Collier declined to conduct the change of plea hearing and invited the government to amend or supersede the information, setting forth the scheme or artifice to defraud in much greater detail. Id. at *12.

The instant Defendants argue that like in Rice, Counts 12 through 17 also represent an expansion of the law because the only alleged involvement of an FDIC-insured bank is the transfer of funds pursuant to a valid request. The Government points out that in Warshak, the Sixth Circuit acknowledged that other circuits require an intent to defraud or cause some loss to a bank and expressly rejected that interpretation, stating that "the state of the law is different in this circuit." Warshak, 631 F.3d at 313. While declining to take a position on whether risk of loss is the *sine qua*

*non* of bank fraud, the Government responds that Counts 12 through 17 allege that SunTrust Bank both transferred funds under its control and was exposed to some degree of risk. Thus, it contends that the Defendants' assertions that SunTrust Bank was not actually exposed to a risk of loss is a premature sufficiency of the evidence argument, improper for the Court to consider in a pretrial motion to dismiss. The Court agrees.

First, the Court finds that while <u>Everett</u>, <u>Reaume</u>, and <u>Warshak</u> are cases in which the facts support a finding of some risk of loss to the bank, the Sixth Circuit's analysis indicates that the risk of loss is a part of the transfer of funds: "In such situations [in which there is an intent to defraud a third party that causes the bank to transfer funds], the federally insured bank will almost always be placed at some risk of loss, if only in the loss of some of the deposits, although the perpetrator may intend to defraud someone other than the bank." <u>Everett</u>, 270 F.3d at 991. The Sixth Circuit however distinguishes between a risk of loss to the bank (including that risk of loss inherent in the transfer of funds) and a requirement that the perpetrator of bank fraud intend to defraud or harm the bank. <u>See</u> <u>Warshak</u>, 631 F.3d a t313. With regard to the latter, the Sixth Circuit is quite clear that the intent element of the bank fraud statute may be proven by an intent to defraud a third party that causes a bank to transfer funds or some risk of loss, even when the perpetrator had no intent to harm the bank. <u>Id.</u> Although the Defendants encourage this Court to adopt the holdings of the Second and Third Circuits on this issue, it is the job of this Court to divine and apply Sixth Circuit law. Accordingly, the Court declines to adopt the interpretation of the bank fraud statute advanced by the Defendants.

Secondly, the Court finds that even if the risk of loss is a *de facto*, rather than implicit, requirement, the instant Indictment adequately charges a risk of loss. As discussed above, in order

to resolve a question of whether the Government has alleged facts sufficient to constitute the offense as a matter of law, (1) the issue raised must be a question of law and (2) the relevant facts must be undisputed. Levin, 973 F.2d at 470; Jones, 542 F.2d at 665. The Court finds the question of whether SunTrust Bank experienced a risk of loss when it transferred the funds of its subsidiary SunTrust Mortgage, to which the Defendants had allegedly given material misrepresentations causing the transfer of funds, to be a disputed issue of fact. Unlike in the Rice case, in which Judge Collier based his decision on a plea agreement stating the facts of the case, the Court has no facts before it that have been proven in court or reduced to a written agreement. Moreover, the Government has not expressly alleged the facts regarding the risk of loss in the indictment and, thus, the Court is in no position to determine their sufficiency, even if it were permitted to do so. Instead, the Court finds that the Government has properly pled the offense of bank fraud in Counts 12 through 17, and the question of whether it can prove bank fraud beyond a reasonable doubt is one for the jury.

*(3) Conspiracy Charge (Count 1)*

The Defendants assert that Count 1 fails to state an offense because the defects in the substantive wire fraud charges relating to Citizens Bank and the bank fraud charges relating to SunTrust Bank eliminate two of the four asserted objects of the conspiracy. Because the Court rejects the Defendants' arguments that the wire fraud charges in Counts 2 and 3 and the bank fraud charges in Counts 12 through 17 fail to state an offense, the Court also finds that the instant argument must fail. Moreover, even if the Defendants were correct that two of the four objects of the conspiracy must be dismissed, the other two objects (wire fraud in relation to SunTrust Mortgage and bank fraud with regard to Citizens Bank) remain. Thus, even if the Defendants were correct, the

22

Indictment would still properly allege conspiracy to commit wire and bank fraud.  Accordingly, the Court finds that Count 1 properly states an offense.

*(4) Money Laundering Charges (Counts 20-22)*

The Defendants ask the Court to dismiss the money laundering counts (Counts 20-22) in the Indictment, contending that they also fail to state an offense.  They raise two primary arguments in support of this request: (1) The monetary transactions, which are alleged to constitute the money laundering, occur before the predicate offense is complete and, in this way, merge with the respective predicate offenses, and (2) the Indictment fails to allege that the monetary transaction resulted in profits, rather than receipts, to the Defendants.  The Government responds that the Indictment properly alleges money laundering in Counts 20 through 22.  It argues that the predicate wire fraud offenses were complete upon the wiring of money from the bank and that the monetary transactions alleged in Counts 20 through 22 occurred after the moneys were wired.  It also contends that in the Sixth Circuit, it need only show the gross receipts of wire fraud for the instant money laundering offenses.

Defendant Whaley is charged with money laundering in Counts 20 and 21, and both Defendants are charged with money laundering in Count 22.  All three money laundering counts allege that the Defendants violated 18 U.S.C. §1957, which provides as follows: "Whoever, . . ., knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished[.]" Count 22 alleges that

On or about March 9, 2006, within the Eastern District of Tennessee,

the defendant, JEFFREY WHALEY, aided and abetted by JERRY D. KERLEY, did knowingly engage and attempt to engage in a monetary transaction with a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is by causing a $92,389.40 Guaranty Land Title escrow account check payable to E.W., who had been identified as the "seller" on the HUD-1 Settlement Statement for the 3515 Peggy Lane Property, to be deposited into a GBO Tennessee State Bank account, such property having been derived from a specified lawful activity, that is the execution of the scheme and artifice to defraud alleged in Count 9 of this indictment in violation of Title 18, United States Code, Section 1343, and Tennessee State Bank being a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation.

[Doc. 80, ¶95].[4]

Count 22 incorporates the facts alleged in the wire fraud counts as to SunTrust Bank (Counts 4-9), which in turn incorporate the fraudulent scheme alleged in paragraphs 7 through 15, 26 though 70, and 76 through 78. Count 9 alleges wire fraud affecting a financial institution with regard to the loan for the property at 3515 Peggy Lane. The following time line of events are alleged with regard to Counts 9 and 22: On January 27, 2006, "straw borrower" E.W. agreed to purchase the Peggy Lane

---

[4]Defendant Kerley's motion to dismiss [Doc. 48] relates only to Count 22 (at that time Count 20). Defendant Whaley moved to join [Doc. 52] in this motion, but it was not until oral argument on July 14, 2011, that his counsel requested that Counts 20 and 21, charging only Defendant Whaley, be considered as a part of this motion. The Government objected that it had no notice that it needed to respond to the two additional counts. Defendant Whaley's counsel agreed that she was limited to the arguments advanced in Defendant Kerley's motion and offered to file a supplemental brief, relating how these arguments applied to Counts 20 and 21. No supplemental filing was ever entered. The Court observes that Count 20 charges Defendant Whaley with depositing a $99,350 Guaranty Land Title check into GBO's account on December 21, 2005, which money was derived from the wire fraud alleged in Count 7, and that Defendant Whaley subsequently withdrew $60,594.89 from GBO's account. Count 21 alleges that Defendant Whaley deposited an $81,331.07 Guaranty Land Title check into GBO's account on January 4, 2006, which money was derived from the wire fraud alleged in Count 8, and that Defendant Whaley subsequently withdrew $20,000 from GBO's account. To the extent that these allegations also track those of Count 22, the Court finds that the same analysis would apply to them as well.

property from its owner D.K. for $280, 000. [Doc. 80, ¶63] That same day, E.W. agreed to sell the Peggy Lane property to a "straw purchaser" W.H. for $385,220. [Doc. 80, ¶64] A Uniform Residential Loan Application was submitted to SunTrust Mortgage on behalf of W.H., which application materially misrepresented the amount of cash that W. H. would provide, thereby inducing SunTrust Mortgage to approve the loan to W.H. [Doc. 80, ¶65] On March 8, 2006, SunTrust Mortgage wired $271, 285.96 from its account at SunTrust Bank to Guaranty Land Title's bank account (Guaranty Land Title is a real estate closing agency owned by Defendant Kerley) for the Peggy Lane property transaction. [Doc. 80, ¶69-70] On March 9, 2006, GBO Enterprises (Defendant Whaley's business) issued a check for $4,544.46 to Guaranty Land Title on behalf of W.H. to satisfy the cash from borrower, and Defendant Whaley delivered the check to Guaranty Land Title. [Doc. 80, ¶66-67] Also on March 9, 2006, Guaranty Land Title issued a check for $92,389.40 to E.W., now the seller of the Peggy Lane property, and E.W. endorsed the check and delivered it to Defendant Whaley. [Doc. 80, ¶66-67] On March 9, 2006, Defendant Whaley deposited the $92,389.40 check into GBO's account at Tennessee State Bank. [Doc. 80, ¶20] The Government argues that this $92,389.40 check is criminally derived property valued more than $10,000.

The Defendants first argue that at the time that the money was wired from SunTrust Bank and the $92,389.40 check was deposited into GBO's account, the scheme to defraud SunTrust Mortgage was still ongoing. Thus, they argue that the monetary transaction that is the subject of the money laundering count did not involve proceeds from an earlier, separate criminal act. Instead, they contend that because the $92,389.40 check itself was an integral part of the ongoing scheme alleged in Count 9, it merges into the predicate offense and cannot constitute a monetary transaction under the money laundering statute. The Government contends that the predicate offense of wire fraud was

25

complete upon the wiring of the mortgage proceeds to Guaranty Land Title and that the monetary transaction constituting money laundering occurred thereafter.

As set out above, to commit money laundering, one must "engage in a monetary transaction in criminally derived property." 18 U.S.C. §1957(a). "Criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. §1957(f)(2). The criminally derived property must be within the defendant's control before he or she engages in the monetary transaction that constitutes money laundering. United States v. Griffith, 17 F.3d 865, 878-79 (6th Cir. 1994). Our appellate court has held that "money, once wired by the victims, constitute[s] proceeds of wire fraud." United States v. Prince, 214 F.3d 740, 748 (6th Cir. 2000). Accordingly, once the instant mortgage proceeds were wired from SunTrust Bank to Guaranty Land Title's account on March 8, 2006, they were within the Defendants' control and were proceeds of the alleged wire fraud and criminally derived property. A subsequent monetary transaction, such as depositing the funds into another account, could properly constitute money laundering. See 18 U.S.C. §1957(f)(1) (defining "monetary transaction" as "the deposit . . . of funds or a monetary instrument"). The Court finds that Count 22 sufficiently alleges the offense of wire fraud.

Second, the Defendants argue that the funds alleged in Count 22 were not "proceeds" as defined by the Supreme Court in United States v. Santos, 553 U.S. 507, 509-24 (2008). In Santos, a plurality of the Supreme Court did hold that because the money laundering statutes do not define the term "proceeds," that term can be defined as "profits" to comply with the rule of lenity in certain instances, such as the illegal gambling statute in that case, depending upon the underlying predicate offense. Id. at 511-14. In this case, the Defendants argue that the $92,389.40 check was not the

26

profits of the substantive wire fraud offense but, instead, represents receipts. They point out that the Indictment alleges that the scheme required the Defendants to provide the funds for the "cash from borrower," the mortgage payments, and the maintenance expenses for the properties. [Doc. 80, 8-10, 15] They contend that because at least a portion of the $92,389.40 check alleged in Count 22 would be dedicated to those expenses, Count 22 fails to allege that they conducted a monetary transaction with "proceeds" and, thus, fails to state the offense of money laundering and must be dismissed.

In Santos, the Supreme Court considered "whether the term 'proceeds' in the federal money-laundering statute, 18 U.S.C. §1956(a)(1), means 'receipts' or 'profits[,]'" in the context of a violation of the illegal gambling statute. Id. at 509. Justice Scalia, joined by Justices Souter, Ginsberg, and Thomas,[5] held that "proceeds" means "profits," because the undefined term "proceeds" is ambiguous and the rule of lenity dictates the interpretation more favorable to the defendant. Id. at 511-14. In addressing the government's argument that the "profits" interpretation defeated the purpose of the money laundering statute, Justice Scalia pointed out a merger problem inherent in the "'receipts' interpretation"–payment of the winner in an illegal lottery would cause the violation of the gambling statute to "'merge' with the money-laundering statute[,]" increasing the penalty, which is five years under the gambling statute, by an additional twenty years under the money laundering statute. Id. at 515-16. "Interpreting 'proceeds" to mean 'profits' eliminates the merger problem[, because t]ransactions that normally occur during the course of running a lottery are not identifiable uses of profits and thus do not violate the money-laundering statute." Id. at 517.

Justice Stevens concurred in Justice Scalia's judgment but wrote separately, because he concluded that whether "proceeds" means "receipts" or "profits" under the money laundering statute

---

[5]Justice Thomas joined in all but Part IV of the lead opinion. Id. at 508.

may differ based upon the predicate offense at issue. Id. at 525-27 (Stevens, J., concurring in judgment). Looking to the legislative history of the money laundering statute, Justice Stevens found that Congress expressly "intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." Id. at 526. Justice Stevens was also concerned about a "merger problem": "Allowing the Government to treat the mere payment of an illegal gambling business' operating expenses as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business." Id. at 527. The dissenting opinion, authored by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, holds that "proceeds" means "gross receipts," an interpretation which supports the purposes of the money laundering statute and avoids placing an unnecessary burden on the prosecution in proving the offense. Id. at 531-40 (Alito, J., dissenting). The dissent reasoned that "the so-called merger problem is fundamentally a sentencing problem, and the proper remedy is a sentencing remedy." Id. at 547.

To the Defendants' contention that proceeds must mean profits in this case, the Government responds that in United States v. Kratt, the Sixth Circuit announced a two part test for determining when the Santos plurality opinion applies, i.e., when "proceeds" under the money laundering statute means "profits." 579 F.3d 558, 562 (6th Cir. 2009). According to Kratt, proceeds means profits only when (1) the "predicate offense creates a merger problem that leads to a radical increase in the maximum statutory sentence" and when (2) "nothing in the legislative history suggests that Congress intended such an increase." Id. In the instant case, the Government argues that the predicate offense named in Count 22, wire fraud affecting a financial institution, carries a maximum punishment of

28

thirty years, which is twenty years more than the penalty for a violation of §1957. Accordingly, there is no merger problem of the type that concerned the Supreme Court in Santos. Moreover, the Government argues that when the first prong of Kratt's test is not satisfied, Kratt holds that there is no need to consider the second prong. See id. at 563. Finally, the Government asserts that when Santos is not applicable, the court looks to the rule from prior Sixth Circuit precedent, which holds that "proceeds" always means gross receipts. Kratt, 579 F.3d at 563-64 (citing Prince, 214 F.3d at 747). The Government argues that Kratt's two prong test reveals that Santos is not applicable in the present case and, thus, the Indictment properly alleges money laundering. Finally, the Government argues that even if it were required to prove that the $92,839.40 check included at least $10,000 in profits, that would be an issue of proof and of proper instruction to the jury at trial, not a basis to dismiss Count 22.

The Court agrees with the Government that the definition of proceeds embraced by the plurality opinion in Santos does not apply in this case. Prior to the Santos opinion, Sixth Circuit case law held that "proceeds" meant gross receipts for purposes of the companion money laundering statutes, §§1956 and 1957. Kratt, 579 F.3d at 560; see also Prince, 214 F.3d at 747. In Kratt, our appellate court grappled with how to define "proceeds" in the wake of Santos and concluded that the plurality opinion in Santos required courts to evaluate each of the predicate offenses permitted by the money laundering statutes on an "offense-by-offense" basis in order to determine whether they fell into the "profits" camp or "gross receipts" camp.[6] Id. at 563. In formulating a standard by which

_____

[6]The Sixth Circuit observed that this was a particularly "unsatisfying" approach, both for the practical difficulties it imposed upon litigants and courts, as well as its impact upon the actual application of the rule of lenity to defendants. Kratt, 579 F.3d at 563. Nevertheless, the appellate Court adopted this approach.

courts would make this determination, the court in <u>Kratt</u> looked to the concerns expressed by Justice Stevens in his concurring opinion regarding how to discern which predicate offenses required a showing of profits and which required gross receipts, and the appellate court arrived at the two prong test quoted by the Government above.  <u>Id.</u> at 561-62.  Applying that test to the instant predicate offense of wire fraud affecting a financial institution, the Court concludes, as did the Government, that wire fraud affecting a financial institution has a higher maximum punishment than money laundering and, thus, does not create the merger problem feared by the <u>Santos</u> plurality. Accordingly, <u>Santos</u> does not apply and proceeds means gross receipts in this case.

The Court finds that Counts 20-22 properly state the offense of money laundering, and the Court recommends that the Defendants' motion to dismiss these counts be denied.

### B.  Sufficiency of Notice

Related in part to the arguments addressed above, the Defendants argue that Counts 12 through 17 provide insufficient notice of the bank fraud charges because the Indictment charges them with intent to defraud SunTrust Bank but alleges facts that show they intended to defraud a third party, SunTrust Mortgage, thereby placing SunTrust Bank at a risk of loss.  The Defendants acknowledge that the Sixth Circuit recognizes two ways to commit bank fraud–intent to defraud a bank or intent to defraud a third party that causes a bank to transfer funds or some risk of loss–but they contend that Counts 12 through 17 impermissibly blend the assertion of the first method with factual allegations demonstrating the second.  The Defendants argue that this "disconnect" between the legal theory and the facts alleged in the Indictment deprives them of adequate notice of the charges and prevents them from preparing a defense to these charges.

The Government responds that Counts 12 through 17 properly place the Defendants on notice of the charges. It maintains that the Indictment alleges that the Defendants engaged in a scheme to defraud and obtain money from SunTrust Bank, which is an FDIC insured financial institution. It asserts that this allegation does not limit its proof to showing that the Defendants had a specific intent to defraud SunTrust Bank. Instead, it argues that the Reaume decision illustrates that the indictment may allege an intent to defraud a bank, yet, the government may prove that allegation with an intent to defraud a third party. See Reaume, 338 F.3d at 580-82. In Reaume, the "indictment alleged that [the defendant] knowingly executed a scheme to defraud Monroe Bank and Trust." Id. at 579. In evaluating the sufficiency of the evidence at trial, the court held that the government could satisfy the intent element of §1344 without proving the defendant's specific intent to defraud the bank but by proving the defendant's intent to defraud various retailers by presenting checks on accounts containing insufficient funds. See Reaume, 338 F.3d at 580-82. Thus, the Government reasons that the instant counts provide the Defendant with sufficient notice of the bank fraud allegations.

As stated above, the Sixth Amendment provides that all criminal defendants "enjoy the right . . . to be informed of the nature and the cause of the accusations[.]" U.S. Const. amend. VI. Constitutionally sufficient notice requires both that the indictment charge all the elements of the offense and that it allege enough facts to "inform the accused of the specific offense, coming under the general description, with which he is charged.'" Hamling, 418 U.S. at 118; Landham, 251 F.3d at 1079.

In the present case, as discussed in section A.2. above, Counts 12 through 17 each charge all three elements of bank fraud, alleging that the Defendants knowingly executed or attempted to

31

execute a scheme to defraud SunTrust Bank, a financial institution; that the Defendants executed the scheme with the intent to defraud a third party SunTrust Mortgage, thereby causing SunTrust Bank to transfer funds and causing SunTrust Bank some risk of loss; and that SunTrust Bank was insured by the FDIC. See Warshak, 631 F.3d at 312-13 (listing the elements of bank fraud and holding that the intent element may be satisfied by showing that the defendant intended to defraud a third party and caused the bank to transfer funds or suffer a risk of loss). The Defendants argue that Counts 12 through 17 suffer from a constitutional notice problem because the facts alleged (showing a scheme to defraud SunTrust Mortgage) do not align with the legal theory asserted (a scheme to defraud SunTrust Bank). Based upon the case law, the Court finds no "disconnect."

The Sixth Circuit has determined that proof of a scheme to defraud a third party can satisfy the intent element of bank fraud. Warshak, 631 F.3d at 313; Reaume, 338 F.3d at 583; Everett, 270 F.3d at 991. "[I]ntent to defraud the federally insured institution *itself* is satisfied where: (1) the intent to defraud some entity was present; and (2) that intended fraud placed a federally insured financial institution at a risk of loss." Reaume, 338 F.3d at 582 (emphasis added). Accordingly, the Court finds that Counts 12 through 17 place the Defendants on notice that they must defend allegations that SunTrust Bank both transferred funds and suffered a risk of loss. The Court finds the notice provided by the charges is constitutionally sufficient.


## C. Multiplicity

The Defendants argue the counts in the Indictment violate Double Jeopardy because they seek to punish the same offense multiple times. They contend the Indictment is multiplicitous in three ways: (1) the wire fraud and bank fraud counts impermissibly punish them twice for the same

32

conduct, (2) the bank fraud counts seek to punish them for each executing act, rather than for each scheme to defraud; and (3) the conspiracy count is based upon multiplicitous wire and bank fraud counts. The Court will examine each of these contentions in turn.

The Fifth Amendment's prohibition against twice placing a defendant in jeopardy for the same offense shields the defendant from three potential harms: A "second prosecution for an offense after initial acquittal, second prosecution for an offense after an initial conviction, and 'multiple punishments for the same offense.'" United States v. Gibbons, 994 F.2d 299, 301 (6th Cir.1993) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)). A multiplicitous indictment charges a single offense in multiple counts thereby infringing upon the third category, multiple punishments for a single offense. See United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir.1981). Multiplicity in the indictment may also "unfairly suggest that more than one crime has been committed." United States v. Swafford, 512 F.3d 833, 844 (6th Cir. 2008).

Despite these dangers of multiplicity, "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." Albernaz v. United States, 450 U.S. 333, 344 n.3 (1981). Ultimately, the power to determine what constitutes a criminal offense and the punishment therefor belongs to the legislative branch. Whalen v. United States, 445 U.S. 684, 689 (1980). Thus, the initial inquiry in determining whether a single act or transaction may be punished under separate statutes is to determine "'whether Congress intended to punish each statutory violation separately.'" United States v. DeCarlo, 434 F.3d 447, 454 (6th Cir. 2006) (quoting Jeffers v. United States, 432 U.S. 137, 155 (1977)). If there is no clear expression of legislative intent, then "[t]he general test for compliance with the double jeopardy clause looks to 'whether each [count] requires proof of a fact which the other does not.'" Gibbons, 994 F.2d at 301

(quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). "A defendant may be charged with multiple offenses based on the same underlying conduct as long as each offense requires proof of an element not required by the other." United States v. Kelly, 204 F.3d 652, 656 (6th Cir. 2000); see Blockburger, 284 U.S. at 304. This analysis looks to the elements of the statutes under consideration, rather than to the proof. DeCarlo, 434 F.3d at 455. "The Double Jeopardy Clause is not violated merely because the same evidence is used to establish more than one statutory violation if discrete elements must be proved in order to make out a violation of each statute." Id. at 455-56. With these principles in mind, the Court turns to the Defendants' allegations of multiplicity.

*(1) Multiplicity of Wire and Bank Fraud Counts*

The Defendants argue that the wire fraud counts (Counts 2-9) and the bank fraud counts (Counts 10-17) are multiplicitous because Congress expressed no clear intent to permit multiple punishments under these two statutes and because the offense of bank fraud requires no elements that are not also necessary to prove wire fraud affecting a financial institution. The Government responds that the legislative history for the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) clearly reveals that Congress intended that bank and wire fraud violations could be simultaneously charged. Alternatively, it contends that wire fraud requires proof of a wire transmission, while bank fraud requires proof of a scheme to defraud a bank. Thus, it argues that each statute requires proof of an element that the other does not, demonstrating that they are not multiplicitous.

*(i) Legislative Intent*

34

As noted above, the Court need not engage in a <u>Blockburger</u> analysis if Congress has clearly permitted multiple punishments. <u>Whalen</u>, 445 U.S. at 688. "To determine the congressional intent it is necessary to examine the statutory language and the legislative history, as well as to utilize other techniques of statutory construction." <u>Pandelli v. United States</u>, 635 F.2d 533, 536 (6th Cir. 1980), <u>see also</u> <u>DeCarlo</u>, 434 F.3d at 454 (quoting <u>Pandelli</u>). Determination of legislative intent begins with the presumption that "where two statutory provisions proscribe the same offense, a legislature does not intend to impose two punishments for that offense." <u>Rutledge v. United States</u>, 517 U. S. 292, 297 (1996), <u>see also</u> <u>DeCarlo</u>, 434 F.3d at 454 (quoting <u>Rutledge</u>).

The Court first examines the statutory language for a statement of congressional intent. <u>See, e.g.</u>, <u>id.</u> Section 1343, proscribing wire fraud affecting a financial institution, and §1344, proscribing bank fraud, charge as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . or both. If the violation . . . affects a financial institution, such person shall be [subject to additional punishment].

18 U.S.C. §1343.

> Whoever knowingly executes, or attempts to execute, a scheme or artifice–
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or

35

promises;

shall be fined . . . or imprisoned . . . or both.

18 U.S.C. §1344. Both statutes use the term "scheme or artifice to defraud," which Congress defined for purposes of both §1343 and §1344 as including "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346. By providing a common definition for a common term, Congress was no doubt "aware of the interplay between" these two statutes. See DeCarlo, 434 F.3d at 455. However, the Court finds nothing in the statutory language that reveals a clear legislative intent to punish a single transaction under both statutes. C.f., Gibbons, 994 F.2d at 302 (holding that the statutory language "in addition to the punishment provided for such crime" in 18 U.S.C. §924(c) reveals Congress's intent to authorize a punishment cumulative to that of the predicate felony).

The parties point to the legislative history, with the Government contending that it reveals a clear intent by Congress that both statutes can apply to a single course of conduct and the Defendants arguing that it shows no such intent. The Defendant contends that the legislative history for the bank fraud statute, shows that the statute was enacted in 1984 to fill what Congress perceived to be a "serious gap[] . . . in federal jurisdiction over frauds against banks and other credit institutions," after the dilution of wire fraud and other statutes by court decisions. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3517-18. Thus, the purpose of the bank fraud statute was to address the "gaps in existing statutes" and "the lack of a unitary provision aimed directly at the problem of bank fraud." Id. at 3518-19. In explaining the provisions of the statute, the Senate Report states that the bank fraud statute is "modeled on the present wire and mail fraud statutes[.]" Id. at 3519. The report goes on to explain that "[w]hile the basis for federal jurisdiction

36

in these existing general fraud statutes is the use of the mails or wire communications, in the [bank fraud statute], jurisdiction is based on the fact that the victim of the offense is a federally controlled or insured institution[.]" Id. Although this history explains the need for the bank fraud statute as well as its similarities to and differences from the wire fraud statute, the Court finds that it contains no explicit statement of legislative intent regarding whether the Government may simultaneously charge both the bank and wire fraud statutes for the same course of conduct.

The Government argues that the legislative history for the 1984 bank fraud statute is irrelevant because the offense of wire fraud affecting a financial institution was not created until Congress passed FIRREA in 1989. Instead, the Government quotes at length from the House of Representatives Report explaining the 1989 legislation, which in pertinent part, significantly increased the "criminal penalties for offenses in Title 18 of the United States Code that affected financial institutions." H.R. Rep. No. 10154(I) (1989), reprinted in 1989 U.S.C.C.A.N. 86, 268. The committee stated that enacting the proposed enhanced regulations and criminal penalties was necessary "absolutely to respond to a serious epidemic of financial institution insider abuse and criminal misconduct and to prevent its recurrence in the future. Without enactment of this title, as now reported, the U.S. Government will continue to lose the battle against such misfeasance and malfeasance." Id. at 260. The report relates that this abuse and misconduct, specifically by those inside the financial institutions, has caused or contributed to the failure of hundreds of banks and the loss of millions of dollars to the government. Id. The report decries the lack of sufficient resources and prosecutors to prosecute the backlog of cases in this area and observes that "[t]he lack of eventual prosecutions and the imposition of often lenient sentences together constitute the greatest single impediment to deterring criminal behavior in the banking and thrift industry." Id. at 260-61.

The committee states that the new legislation "closes certain loopholes [and] correlates serious penalties to serious misconduct[.]" Id. at 261.

> The Committee believes that the enhancement of the regulatory powers and criminal justice provisions should go far in restoring public confidence in the nation's financial system and serve to protect the public interest. This Title gives the regulators and the Justice Department the tools which they need and the responsibilities they must accept, to punish culpable individuals, to turn this situation around, and to prevent these tremendous losses to the Federal deposit insurance funds from ever again recurring.

Id. at 262. In addition to adding the enhanced punishment for wire fraud affecting a financial institution, FIRREA increased the maximum penalty for bank fraud, making it the same as the penalty for the new enhanced wire fraud provision; expanded the statute of limitations for offenses affecting a financial institution; and standardized the definition of "financial institution" throughout Title 18.

From the committee report and the changes to the bank and wire fraud statutes, the Government deduces that "Congress's intent was to create a comprehensive arsenal of prosecutive weapons that Department of Justice prosecutors were commanded to apply against offensive conduct that affected a financial institution." [Doc. 60, p.18] The Government argues that the point of these overlapping statutes was "'to punish culpable individuals' by all applicable means." [Doc. 60, p.18] The Government also points to a subsequent revision to §§ 1343 and 1344 as indicative of legislative intent. In 1990, Congress increased the penalty for both bank fraud and wire fraud affecting a financial institution from twenty to thirty years imprisonment. See H.R. Rep. No. 101-681(I) (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 1990 WL 188857, at 62. The Government asserts that this amendment further underscores that Congress intended for bank fraud and wire fraud affecting a

38

financial institution to overlap and complement each other and to apply to any conduct affecting a financial institution.

The Defendants respond that nothing in the legislative history for the 1989 and 1990 amendments overcomes the presumption that Congress does not intend multiple punishments. The Court agrees. While the legislative history reveals Congress's concern for effectively prosecuting numerous cases in the wake of the savings and loan crisis and for punishing those responsible such that future violations will be deterred, it does not clearly demonstrate that Congress intended to punish a single course of conduct involving both bank fraud and the use of wire transmissions under both statutes. The Court finds that the creation of a "comprehensive arsenal of prosecutive weapons" (as the Government describes the statutory revisions) reflects Congress's intent to bring perpetrators to justice one way or another, rather than in every way possible. As pointed out by the Defendants, Congress knows how to express its clear intent to permit multiple punishments when it chooses to do so. See, e.g., United States v. White, 296 F. App'x 483, 490-91 (6th Cir. Oct. 10, 2008) (unpub'd) (finding that the legislative history clearly and expressly states that Congress intended an additional punishment for aggravated identity theft when the defendant is also convicted of access device fraud); United States v. Holdridge, No. 92-1889, 1994 WL 399526, *2-3 (6th Cir. July 25, 1994) (quoting the committee report and holding that Congress clearly expressed its intent that a defendant be punished for a §924(c) offense as well as for the underlying crime of violence, even if that crime also includes an enhanced punishment when committed with a dangerous weapon). Congress expressed no such clear intent in the legislative history herein. Accordingly, the Court will compare the elements of the offenses to determine whether they are multiplicitous.

*(ii) Blockburger Test*

If the congressional intent is not express and cannot be discerned from statutory construction, then the Court employs the test set forth in Blockburger v. United States, 284 U.S. 299 (1932), which examines the elements of the offenses to see if each requires proof of a fact that the other does not. DeCarlo, 434 F.3d at 455. In conducting this analysis, the Court must look to the statutory elements of the charged offenses, rather than the anticipated proof. Id.; United States v. Barrett, 933 F.2d 355, 360-61 (6th Cir. 1991). However, "when dealing with complex and overlapping statutes that define multiple ways that they may be violated and contain alternative elements[,]" the Court may use a modified version of the Blockburger test that compares only those elements of the statutes that conform to the government's theory of the case. DeCarlo, 434 F.3d at 456. The Defendants argue that the wire fraud and bank fraud counts are multiplicitous under either the traditional or the modified Blockburger test. The Government responds that either version of the Blockburger test reveals that the Indictment properly charges both offenses.

Wire fraud requires proof of "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." United States v. Prince, 214 F.3d 740, 746-47 (6th Cir. 2000). In the present case, the Defendants are charged with the enhanced version of wire fraud affecting a financial institution, so the Government must also prove that the wire fraud "affected a financial institution," 18 U.S.C. §1343, and that the financial institution is "an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act)[,]" 18 U.S.C. §20(1).[7] Bank fraud requires proof "(1)

---

[7]The Government offers the following elements of wire fraud affecting a financial institution from the Sixth Circuit Pattern Criminal Jury Instructions:

40

that the defendant knowingly executed or attempted to execute a scheme to defraud a financial

institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial

institution was insured by the FDIC."[8] <u>Everett</u>, 270 F.3d at 989. Wire fraud that affects a financial

---

> First, that the defendant knowingly participated in, devised, or
> intended to devise a scheme to defraud in order to obtain money or
> property;
>
> Second, that the scheme included a material misrepresentation or
> concealment of a material fact;
>
> Third, that the defendant had the intent to defraud; . . .
>
> Fourth, that the defendant used wire, radio or television
> communications, or caused another to use wire, radio or television
> communications in interstate or foreign commerce in furtherance
> of the scheme; [and
>
> Fifth, that the scheme affected a financial institution that was
> federally insured.]

Sixth Circuit Pattern Criminal Jury Instructions, Chapter 10.02, at 274 (2009) (alteration in Doc.
60).

[8]The Government proposes the following elements for bank fraud, taken from the Sixth
Circuit Pattern Criminal Jury Instructions:

> First, that the defendant knowingly executed, or attempted to
> execute a scheme to defraud a financial institution or to obtain
> money or other property owned by or in the control of a financial
> institution by means of false or fraudulent pretenses,
> representations or promises;
>
> Second, that the scheme related to a material fact or included a
> material misrepresentation or concealment of a material fact;
>
> Third, that the defendant had the intent to defraud; and
>
> Fourth, that the financial institution was federally insured.

Sixth Circuit Pattern Criminal Jury Instructions, Chapter 10.03, at 282 (2009).

41

institution clearly requires proof of an element not required by bank fraud, the use of wire communications in furtherance of the scheme. It also requires proof of a causation-type element: that the offense affected a financial institution. The dispute turns upon whether bank fraud also contains an additional element.

The Government contends that bank fraud also requires an additional element not required by wire fraud: proof of a scheme to defraud a financial institution or to obtain money or other property owned or controlled by the financial institution. It argues that this element of bank fraud is different than wire fraud's requirement that the scheme to defraud merely affect a financial institution. See United States v. Regensberg, 604 F. Supp. 2d 625, 634 (S.D.N.Y. 2009) (holding that charging securities fraud and wire fraud did not violate double jeopardy because "[s]ecurities fraud requires a showing of fraud in connection with the purchase or sale of any security—an element not required to prove wire fraud. Wire fraud requires a showing of use of interstate wires—an element not required to prove securities fraud."). The Government contends that "it is possible for a fraudulent scheme to *affect* a financial institution without the scheme being a scheme to *defraud a financial institution*." [Doc. 60, p.22 (emphasis in original)]

First, the Court finds that the statute proscribing wire fraud affecting a financial institution permits the scheme to defraud to be directed toward anyone, but the bank fraud statute requires that a financial institution be the target of the scheme to defraud or to obtain money or property. Moreover, the bank fraud statute contains no causation-style element, as there is no element requiring any impact on the financial institution. The bank fraud statute requires that the financial

institution be the target of the scheme to defraud,[9] whereas the wire fraud statute enhances the

penalty if a financial institution is affected by the fraud.[10] In this way, the bank fraud statute requires

an element not required for wire fraud. Accordingly, based upon a comparison of the elements of

---

[9]While a "scheme or artifice to defraud" defies precise definition, the Sixth Circuit has held that "[a] scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money . . . or property by means of false or fraudulent pretenses, representations, or promises." United States v. Gold Unlimited, Inc., 177 F.3d 472, 479 (6th Cir. 1999); Warshak, 631 F.3d at 310-11 (quoting Gold Unlimited). With regard to the mail fraud statute, the Sixth Circuit has recognized that a "scheme to defraud" is not constrained by a technical definition, but, instead, the "standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir. 1979) (quoting United States v. Bruce, 488 F.2d 1224, 1229 (5th Cir. 1973)); Warshak, 631 F.3d at 311 (quoting Van Dyke).

[10]The appellate courts are divided as to whether the element of wire fraud requiring that a financial institution be "affected" requires that the financial institution experience an actual loss or whether a risk of loss is sufficient to constitute an affect. The Fourth Circuit appears to require some type of actual loss to the financial institution. United States v. Ubakanma, 215 F.3d 421, 426 (4th Cir. 2000) (determining that "a wire fraud offense under section 1343 'affected' a financial institution only if the institution itself were victimized by the fraud, as opposed to the scheme's mere utilization of the financial institution in the transfer of funds"); see also United States v. Agne, 214 F.3d 47, 51 (1st Cir. 2000) (agreeing without deciding that the enhanced version of wire fraud must impose "some negative consequence to the financial institution"). The Seventh Circuit holds that a risk of loss is sufficient to constitute an affect on a financial institution. United States v. Serpico, 320 F.3d 691, 694-95 (7th Cir. 2003) (holding that risk of loss is sufficient to show an affect on a financial institution under the wire fraud statute: "as society punishes someone who recklessly fires a gun, whether or not he hits anyone, protection for financial institutions is much more effective if there's a cost to putting those institutions at risk, whether or not there is actual harm."); see also United States v. Mullins, 613 F.3d 1273, 1278-79 (10th Cir.) (affirming district courts's determination that affecting means exposing "the financial institution to a new or increased risk of loss or caus[ing] the financial institution to suffer an actual loss" and rejecting mere use of a financial institution as sufficient), cert. denied, 131 S. Ct. 582 (2010); United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) (finding that parent financial institution was "affected" for purposes of the wire fraud statute when its wholly-owned subsidiary suffered a $150,000 loss due to the fraudulent scheme); United States v. Pelullo, 964 F.2d 193, 215 (3rd Cir. 1992) (rejecting the defendant's argument that "a fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent, [as] a clearly untenable assumption" due to the broad language of affecting a financial institution). The Sixth Circuit has not weighed in on this issue.

wire and bank fraud, the Court finds that the wire and bank fraud counts are not multiplicitous under the traditional Blockburger analysis.

The modified Blockburger test, however, yields a different result, at least with regard to the bank fraud counts relating to SunTrust Bank. The modified test applies when the statutes at issue are complex and contain alternative elements or may be violated in multiple ways. DeCarlo, 434 F.3d at 456. In employing the modified test, the court lists the elements of the statutes by selecting from the alternative elements only those that are charged or conform to the government's theory in the case at hand, and then, it compares only those relevant elements from the statutes. Id. This test still does not look to the facts or the evidence in the case. Id.

In the instant wire fraud counts, the elements are the same as under the traditional test: (1) that the defendant knowingly employed or devised a scheme to defraud in order to obtain money or property, (2) that the defendant used interstate wire communications in furtherance of that scheme, (3) that the defendant intended to deprive a victim of money or property, (4) that the wire fraud affected a financial institution, and (5) that the financial institution is federally insured. As discussed in section A(2) above with regard to the bank fraud charges as to SunTrust Bank, the intent to defraud element is satisfied by proof of an intent to defraud a non-bank entity causing a financial institution to transfer funds or to incur a risk of loss. Accordingly, the financial institution is no longer the target of the scheme to defraud, removing the differing element in bank fraud, at least as it is charged in Counts 12 through 17. In other words, in the bank fraud counts against SunTrust *Bank*, the Government is essentially charging that SunTrust Bank is deemed defrauded (transferred money and/or incurred some risk) by a scheme to defraud Sun Trust *Mortgage*. In the corresponding wire fraud counts, the Indictment charges that SunTrust Bank is the affected financial institution by

44

virtue of the same scheme to defraud SunTrust Mortgage. While the Court agrees with the Government that the counts are not multiplicitous under the traditional <u>Blockburger</u> test, the Court finds that the wire fraud counts (Counts 4-9) and the bank fraud counts (Counts 12-17) relating to SunTrust Bank are multiplicitous as pled.

The Government argues that even if some of the counts are found to be multiplicitous, the remedy is not dismissal but, instead, that the multiplicitous counts be merged or vacated at sentencing.[11] "[T]he prosecution has broad discretion in bringing criminal cases, <u>Ball v. United States</u>, 470 U.S. 856, 859 . . . (1985), and . . . the district court has discretion in deciding whether to require the prosecution to elect between multiplicitous counts especially 'when the mere making of the charges would prejudice the defendant with the jury.'" <u>United States v. Throneburg</u>, 921 F.2d 654, 657 (6th Cir. 1990) (quoting <u>United States v. Reed</u>, 639 F.2d 896, 904 n. 6 (2d Cir.1981)). In the present case, the Court finds the multiplication of counts may prejudice the jury against the Defendants because the numerous charges unfairly suggest that the Defendants committed multiple crimes. Accordingly, the Court recommends that Counts 4 through 9 alleging wire fraud affecting SunTrust Bank and Counts 12 through 17 alleging bank fraud as to SunTrust Bank be merged prior

---

[11]At the July 14 hearing, the Government briefly argued that if the Court found the wire and bank fraud counts to be multiplicitous, the counts should be permitted to remain as charged because bank fraud would be a lesser included offense of wire fraud affecting a financial institution. Whether an instruction on a lesser included offense is appropriate is a matter for the District Judge to determine, but the Court would note that an instruction on a lesser included offense is generally not warranted when the proof of the element distinguishing the greater offense from the lesser is not disputed. <u>United States v. Moore</u>, 917 F.2d 215, 228 (6th Cir. 1990). In the present case, the Court anticipates that the fact of the wire transfers of funds from SunTrust Bank to Guarantee Land Title will not be in dispute. Nevertheless, the Court finds the possibility that bank fraud may be found to be a lesser included offense does not alleviate the concern that the multiple counts of bank and wire fraud as to SunTrust Bank may unfairly leave the jury with the impression that the Defendants have committed numerous crimes.

to trial because they are multiplicitous.

*(2) Multiplicity of Bank Fraud Counts*

The Defendants also argue that the bank fraud counts (Counts 10-17) are multiplicitous. They contend that the Indictment charges two schemes to defraud financial institutions: a scheme to defraud Citizens Bank and a scheme to defraud SunTrust Bank. The Defendants assert that Counts 10 through 17 improperly charge them with each *act* of execution for these two schemes, rather than charging them with two executions of the two schemes. The Government responds that each loan transaction with regard to the eight properties at issue violated a separate obligation to be truthful. Thus, it argues that the eight counts of bank fraud do not violate double jeopardy.

Counts 10 and 11 allege that the Defendants, knowingly and with intent to defraud, executed a scheme to defraud Citizens Bank, a federally insured financial institution, to obtain money, funds and credits in Citizens Bank's control by means of materially false representations and omissions. [Doc. 80, ¶81] Count 10 states that the Defendants executed this scheme to defraud Citizens Bank by submitting a false HUD-1 Settlement Statement regarding the 1230 Bird Nest Way property on October 21, 2005. Count 11 states that the Defendants executed this scheme to defraud Citizens Bank by submitting a false HUD-1 Settlement Statement regarding the 1437 Eagle Cloud Way property on November 10, 2005. Counts 12 through 17 allege that the Defendants, knowingly and with intent to defraud, executed a scheme to defraud SunTrust Bank, a federally insured financial institution, to obtain money, funds and credits in SunTrust Bank's control by means of materially false representations and omissions. [Doc. 80, ¶85] Count 12 states that the Defendants executed this scheme to defraud SunTrust Bank by submitting a false HUD-1 Settlement Statement regarding

46

the 1518 Firefly Trail Way property on November 10, 2005. Count 13 states that the Defendants executed this scheme to defraud SunTrust Bank by submitting a false HUD-1 Settlement Statement regarding the 1234 Bird Nest Way property on November 17, 2005. Count 14 states that the Defendants executed this scheme to defraud SunTrust Bank by submitting a false HUD-1 Settlement Statement regarding the 1016 Black Bear Cub Way property on November 30, 2005. Count 15 states that the Defendants executed this scheme to defraud SunTrust Bank by submitting a false HUD-1 Settlement Statement regarding the 1531 Trappers Ridge Lane property on December 20, 2005. Count 16 states that the Defendants executed this scheme to defraud SunTrust Bank by submitting a false HUD-1 Settlement Statement regarding the 954 Black Bear Cub Way property on January 4, 2006. Finally, Count 16 states that the Defendants executed this scheme to defraud SunTrust Bank by submitting a false HUD-1 Settlement Statement regarding the 3515 Peggy Lane property on March 8, 2006.

The Defendants argue that bank fraud criminalizes the overall execution of a scheme to defraud a bank, not the individual acts in execution of that scheme. The Defendants assert that because the Indictment alleges only two schemes to defraud, it can support only two executions of those schemes and, therefore, only two counts of bank fraud. Accordingly, they maintain that Counts 10 -11 and Counts 12-17 are multiplicitous.

In contrast to the wire fraud statute, which criminalizes each wire transmission in furtherance of the scheme, United States v. Anders, No. 93-512, 1993 WL 533529, *11 (6th Cir. Dec. 21, 1993), the bank fraud statutes proscribes the execution or attempted execution of a scheme to defraud a financial institution. 18 U.S.C. §1344. The parties in the instant case disagree over what constitutes an execution. The Fifth Circuit has held that while "the mail and wire fraud statutes punish each act

47

in furtherance, or execution, of the scheme[, ] the bank fraud statute imposes punishment only for each execution of the scheme." United States v. Lemons, 941 F.2d 309, 318 (5th Cir. 1991). In Lemons, the defendant induced his employer, a financial institution, to make a multimillion dollar loan for a real estate transaction without disclosing that part of the loan proceeds would be used for "fees" for himself and another individual. Lemons, 941 F.2d at 310-13. The "fee" was dispersed to Lemons through a third party in a series of payments, including the forgiveness of a prior loan from the third party. Id. Lemons was charged with bank fraud for each of these payments. Id. The Lemons court concluded that there existed only one scheme to defraud the financial institution; and, thus, the "movement of the benefit to Lemons, although in several separate stages or acts, was only part of but one performance, one completion, one execution of that scheme." Id.

The Sixth Circuit has determined that each act concealing the defendant's embezzlement from a financial institution was a separate execution of the scheme to defraud. Anders, 1993 WL 533529, at *14. In Anders, the defendant, a bank teller, was convicted of three counts of bank fraud and one count of misapplying bank funds for diverting cash shipped from the main branch of the bank to herself and another teller on three occasions, delaying the documentation for the a cash shipment each time, and attempting to cover the deficit with a check from a bank customer. Id. at *10-11. The court analyzed Lemons and cases from other circuits to determine what constitutes an execution of a scheme to defraud under the bank fraud statute. Id. at 13-14. The court observed that "the common thread among the cases is that a scheme or artifice is 'executed' by the movement of money, funds or other assets from the institution." Id. at 14 (quoting United States v. Mancuso, 799 F. Supp. 567, 571 (E.D.N.C. 1992)). The appellate court held that each time Anders acted to conceal the theft of bank funds was a separate execution because each act served to defraud the bank. Id.

48

"Two transactions may have a common purpose but constitute separate executions of a scheme when each involves a new and separate obligation to be truthful." United States v. Menichino, Nos. 93-1674, 93-1675, 1994 WL 381778, *5 (6th Cir. July 20, 1994). In Menichino, the defendant "used nine 'front' borrowers to obtain 14 discrete loans, albeit from the same bank[,]" and was charged with fourteen counts of bank fraud. Id. In addressing the defendant's multiplicity argument, the Sixth Circuit reasoned that each loan application involved a separate duty of honesty on the part of the defendant. Id. From this, the court concluded that "each fraudulently obtained loan was a separate 'execution', for which separate punishments do not violate the double jeopardy clause." Id.

In the present case, the Court finds that each bank fraud count alleges submission of a separate fraudulent loan document for a separate and distinct property and, thus, alleges a separate violation of the Defendants' duty to be truthful, i.e., a separate execution. Moreover, each submission of an allegedly fraudulent HUD-1 Settlement Statement resulted in the bank's payment of mortgage proceeds to Defendant Kerley's closing agency. Accordingly, the Court finds that the eight separate counts for bank fraud are not multiplicitous.

*(3) Multiplicity of Conspiracy Count*

Finally, in their reply brief, the Defendants summarily argue that Count 1 should be dismissed because the wire and bank fraud counts, upon which Count 1 is based, are multiplicitous. It is well settled that, generally, charging a defendant with conspiracy and with the substantive offenses that are the overt acts in furtherance of that conspiracy does not violate double jeopardy. Pinkerton v. United States, 328 U.S. 640, 643-44 (1946) (noting the exception being when the

substantive offense has as an element the agreement of two individuals).  "A conspiracy is a partnership in crime.  It has ingredients, as well as implications, distinct from the completion of the unlawful project."  Id. (internal citations omitted).  The finding that some, or even all, of the substantive offenses were multiplicitous would have no bearing upon the validity of the conspiracy count.  The Court finds that Count 1 does not violate double jeopardy.

### III.  CONCLUSION

After carefully considering the motions, memoranda, oral arguments, and relevant legal authorities, the Court finds that Counts 4 through 9 and Counts 12 through 17 are multiplicitous and should be merged.  Otherwise, the Court finds no basis to dismiss the Fifth Superseding Indictment.  For the reasons set forth herein, it is **RECOMMENDED** that the Defendants' Motion to Dismiss Counts 1 Through 17 [**Doc. 46**] be **GRANTED in part** in that Counts 4 through 9 and Counts 12 through 17 be merged and **DENIED** in all other respects and that the Defendants' Motion to Dismiss Count 20 (Money Laundering) for Failure to State an Offense [**Doc. 48**] be **DENIED**.[12]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[12]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).